23CA1303 Peo v Finney 10-23-2025

COLORADO COURT OF APPEALS

Court of Appeals No. 23CA1303
Elbert County District Court No. 20CR47
Honorable Gary M. Kramer, Judge

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Anthony John Finney,

Defendant-Appellant.

JUDGMENT AFFIRMED

Division VI
Opinion by JUDGE GOMEZ
Welling and Sullivan, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced October 23, 2025

Philip J. Weiser, Attorney General, Jacob R. Lofgren, Senior Assistant Attorney General, Denver, Colorado, for Plaintiff-Appellee

Megan A. Ring, Colorado State Public Defender, Daniel J. Sequeira, Deputy State Public Defender, Denver, Colorado, for Defendant-Appellant

¶ 1    Defendant, Anthony John Finney, appeals the judgment of conviction entered on a jury verdict finding him guilty of vehicular eluding, child abuse, reckless endangerment, speeding, and failure to stop at a stop sign.  We affirm.

## I.    Background

¶ 2    On Valentine's Day in 2020, Finney was driving in his car with his girlfriend, N.G., and her three-year-old son on a rural highway in Elbert County.  Sergeant Michael Skalisky of the Elbert County Sheriff's Office observed Finney speeding and activated his lights to pull Finney over.

¶ 3    Finney pulled to the side of the road, slowly rolling forward, as Skalisky pulled up behind him.  Finney then momentarily came to a complete stop.  But as Skalisky exited his patrol vehicle and walked toward Finney's car, Finney sped off.

¶ 4    Finney then led Skalisky and other officers on a high-speed chase through parts of Elbert and Douglas Counties.  At one point, a Douglas County officer deployed "Stop Sticks" on a road ahead of Finney in an attempt to get him to stop.  The Stop Sticks punctured Finney's tires, but still he kept going.  Skalisky indicated that as Finney did so, he sideswiped a bystander's vehicle.

1

¶ 5    Finney eventually turned into a McDonald's parking lot, where he let out N.G. and her son. He then took off again in his car and successfully evaded the officers' efforts to catch him.

¶ 6    After Skalisky terminated the pursuit, he returned to the McDonald's, where he found N.G. and interviewed her. At first, N.G. provided a different name for the driver, but eventually she identified Finney as the driver. While Skalisky was interviewing her, she received a call from Finney. At Skalisky's direction, she handed the phone to Skalisky to talk with Finney. Finney denied any involvement in the chase and said it couldn't have been him because he was driving a truck (although Skalisky hadn't yet said what kind of vehicle had been involved).

¶ 7    The officers eventually located Finney. He was charged with vehicular eluding, aggravated driving after revocation of his license, child abuse, reckless endangerment, reckless driving, speeding, failure to report an accident, and failure to stop at a stop sign. At trial, the court dismissed the aggravated driving after revocation charge, and the jury acquitted Finney of failure to report an accident but convicted him of the remaining charges (except the reckless driving charge, which the jury never reached because it

2

was instructed that reckless driving was a lesser included offense of vehicular eluding).

¶ 8     Finney now appeals, asserting that (1) the trial court reversibly erred in instructing the jury on the beyond a reasonable doubt standard; (2) the prosecutor committed misconduct during his initial and rebuttal closing arguments; and (3) cumulative error requires reversal of the judgment.  We address — and reject — each of these assertions in turn.

## II.     Reasonable Doubt Instruction

¶ 9     Finney contends that the trial court reversibly erred in instructing the jury on the beyond a reasonable doubt standard. We disagree.

### A.     Additional Background

¶ 10     In 2022, the Colorado Supreme Court Model Criminal Jury Instructions Committee revised the model instruction on reasonable doubt.  Guided by the 2022 model instruction, the trial court gave the jury the following reasonable doubt instruction:

> Every person charged with a crime is presumed innocent.  This presumption of innocence remains with Mr. Finney throughout the trial and should be given effect by you unless, after considering all of the evidence,

3

you are then convinced that Mr. Finney is guilty beyond a reasonable doubt.

The burden of proof in this case is upon the prosecution. The prosecution must prove to the satisfaction of the jury beyond a reasonable doubt the existence of each and every element necessary to constitute the crime charged. This burden requires more than proof that something is highly probable, but it does not require proof with absolute certainty.

Proof beyond a reasonable doubt is proof that leaves you firmly convinced of Mr. Finney's guilt. If you are firmly convinced of Mr. Finney's guilt, then the prosecution has proven the crime charged beyond a reasonable doubt. But if you think there is a real possibility that Mr. Finney is not guilty, then the prosecution has failed to prove the crime charged beyond a reasonable doubt.

After considering all the evidence, if you decide the prosecution has proven each of the elements of a crime charged beyond a reasonable doubt, you should find Mr. Finney guilty of that crime.

After considering all the evidence, if you decide the prosecution has failed to prove any one or more of the elements of a crime charged beyond a reasonable doubt, you should find Mr. Finney not guilty of that crime.

*See* COLJI-Crim. E:03 (2022).[1]

---

[1] The model instruction has since been modified.

4

¶ 11    Defense counsel didn't object to the instruction.

## B.    Applicable Law and Standard of Review

¶ 12    The United States Constitution's Due Process Clause protects defendants from being convicted absent proof beyond a reasonable doubt of every fact necessary to constitute the charged offense. *In re Winship*, 397 U.S. 358, 364 (1970).  "The [reasonable doubt] standard provides concrete substance for the presumption of innocence — that bedrock 'axiomatic and elementary' principle whose 'enforcement lies at the foundation of the administration of our criminal law.'"  *Tibbels v. People*, 2022 CO 1, ¶ 24 (alteration in original) (quoting *Winship*, 397 U.S. at 363).  Thus, a trial court must properly instruct a jury on that standard.  *Id.* at ¶ 25.

¶ 13    However, a trial court retains some flexibility in defining for a jury what constitutes a reasonable doubt, and it isn't required to use any particular form of words.  *Id.*  In determining whether a court's instructions regarding the reasonable doubt standard impermissibly lowered the prosecution's burden of proof, we apply a "functional test" in which we ask "whether there is a reasonable likelihood that the jury understood a contested instruction, in the context of the instructions as a whole and the trial record, to allow

a conviction based on a standard lower than beyond a reasonable doubt." *Id.* at ¶ 36; *accord People v. Schlehuber*, 2025 COA 50, ¶ 13; *People v. Melara*, 2025 COA 48, ¶ 20.

¶ 14 "The model instructions . . . have been approved in principle by our [supreme] court and serve as beacon lights to guide trial courts." *Galvan v. People*, 2020 CO 82, ¶ 38. Nonetheless, they are "not 'a safe harbor that insulates instructional error from reversal.'" *Id.* (quoting *Garcia v. People*, 2019 CO 64, ¶ 22).

¶ 15 We review de novo whether the trial court properly instructed the jury on the law. *Tibbels*, ¶ 22. But as long as the court properly informed the jury of the law, we review its decision to give a particular instruction for an abuse of discretion. *McDonald v. People*, 2021 CO 64, ¶ 54. A court abuses its discretion if its ruling is manifestly arbitrary, unreasonable, or unfair or is based on a misunderstanding of the law. *People v. Owens*, 2024 CO 10, ¶ 65.

¶ 16 We generally review unpreserved issues for plain error, such that reversal is warranted only if the error is both obvious and substantial. *People v. Flynn*, 2019 COA 105, ¶ 39. However, if an instruction "lower[s] the prosecution's burden of proof below the

reasonable doubt standard," it "constitute[s] structural error and require[s] automatic reversal." *Tibbels*, ¶ 22.

## C.     Discussion

¶ 17     Finney challenges the 2022 model jury instruction as given by the trial court due to (1) its equating of reasonable doubt with "a real possibility that the defendant is not guilty" and use of the phrase "firmly convinced" to define proof beyond a reasonable doubt and (2) its failure to instruct the jury that it could consider the "lack of evidence." Neither of these issues merits reversal.

### 1.     Firmly Convinced and Real Possibility

¶ 18     Finney first contends that the trial court's reasonable doubt instruction erroneously described reasonable doubt as a "real possibility that Mr. Finney is not guilty" and defined proof beyond a reasonable doubt as proof that "leaves you firmly convinced of Mr. Finney's guilt." He argues that this language lowered and shifted the burden of proof and required the jury to consider conflicting standards of guilt. Addressing both phrases together, we disagree.

¶ 19     These phrases have been consistently approved by courts as an accurate expression of the reasonable doubt standard. *See, e.g.,* *United States v. Petty*, 856 F.3d 1306, 1310 (10th Cir. 2017) ("[T]he

'firmly convinced' language, juxtaposed with the insistence that a jury must acquit in the presence of 'a real possibility' that the defendant is not guilty, is a correct and comprehensible statement of the reasonable doubt standard." (quoting *United States v. Conway*, 73 F.3d 975, 980 (10th Cir. 1995))); *see also Victor v. Nebraska*, 511 U.S. 1, 27 (1994) (Ginsburg, J., concurring in part and concurring in the judgment) (endorsing a similar definition as "surpass[ing] others . . . in stating the reasonable doubt standard succinctly and comprehensibly").  Divisions of this court have also approved these phrases as "an accurate statement of the law." *Schlehuber*, ¶ 30 (quoting *Melara*, ¶ 30).  We, too, conclude that these phrases accurately state the law.

¶ 20    Contrary to Finney's argument, neither phrase lowers the prosecution's burden of proof.  As the *Schlehuber* division explained, "The phrase 'firmly convinced' correctly connotes a standard of 'near certitude' — one that is higher than 'highly probable' but stops short of absolute certainty."  *Id.* at ¶ 31 (quoting *Jackson v. Virginia*, 443 U.S. 307, 315 (1979)); *see also United States v. Williams*, 20 F.3d 125, 131 (5th Cir. 1994) ("By repeating the admonition that the jury had to be firmly convinced of the

8

[defendants'] guilt and by explaining that the government did not have to prove the [defendants] guilty beyond all possible doubt, the [court] sufficiently communicated to the jury that they had to find the [defendants] guilty to a near certainty."); *United States v. Barrera-Gonzales*, 952 F.2d 1269, 1271 (10th Cir. 1992) (agreeing with the statement that "a person who is 'firmly convinced' has no reasonable doubt"). "And the phrase 'real possibility' correctly directs the jury not to acquit the defendant simply because it can conceive of *some* fanciful possibility that the defendant is not guilty." *Schlehuber*, ¶ 31; *see also Victor*, 511 U.S. at 17 (approving of an instruction providing that a reasonable doubt is "not a mere possible doubt"); *Williams*, 20 F.3d at 131 ("[An] instruction's 'real possibility' formulation explain[ed] that the beyond a reasonable doubt standard does not require 'proof that overcomes every possible doubt.'").

¶ 21   We are not persuaded otherwise by Finney's reliance on a Hawaii case in arguing that "firmly convinced" is more akin to the lower standard of clear and convincing evidence than to proof beyond a reasonable doubt. *See State v. Perez*, 976 P.2d 427, 442-43 (Haw. Ct. App. 1998), *aff'd in part and rev'd in part on other*

9

*grounds*, 976 P.2d 379 (Haw. 1999). As the *Schlehuber* division explained, "Clear and convincing evidence is 'evidence that is highly probable and free from serious or substantial doubt.'" *Schlehuber*, ¶ 32 (quoting *Destination Maternity v. Burren*, 2020 CO 41, ¶ 10). In contrast, the instruction used in this case, as in *Schlehuber*, stated that proof beyond a reasonable doubt "requires *more* than proof that something is highly probable." *Id.* (citation omitted). And, as in *Schlehuber*, the instruction "require[d] the prosecution to dispel any 'real possibility' the defendant [wa]s not guilty, not just a serious or substantial one." *Id.* (citation omitted); *see also United States v. Brand*, 80 F.3d 560, 566 (1st Cir. 1996) (concluding that an instruction's "firmly convinced" language did not suggest a burden of proof akin to the civil "clear and convincing" standard, as the instructions as a whole conveyed the meaning of proof beyond a reasonable doubt).

¶ 22 Additionally, "equat[ing] proof 'beyond a reasonable doubt' with a 'real possibility'" that the defendant is not guilty did not, as Finney contends, shift the burden of proof to him by requiring him to prove there was a "real possibility" he wasn't guilty. As in *Schlehuber*, "[n]othing in that phrase suggests that [Finney] must be

10

'the source of the "real possibility."'" *Schlehuber*, ¶ 34 (quoting *United States v. Taylor*, 997 F.2d 1551, 1557 (D.C. Cir. 1993)); *accord Conway*, 73 F.3d at 980; *United States v. Hunt*, 794 F.2d 1095, 1101 (5th Cir. 1986). On the contrary, the trial court in this case instructed the jury multiple times, including during voir dire and in its final jury instructions, that the prosecution bore the burden of proving each element of the offenses beyond a reasonable doubt. The "real possibility" language in the reasonable doubt instruction "simply explained the threshold the prosecution [had to] overcome to do so." *Schlehuber*, ¶ 34.

¶ 23    Finally, we reject Finney's contention that the phrases create two conflicting standards. Rather, as the *Schlehuber* division reasoned, "the phrases work together to give the jury a complete picture of the reasonable doubt standard": "The first — 'firmly convinced' — describes what it means to have no reasonable doubt," and "[t]he second — 'real possibility' — contrasts that with what it means to have a reasonable doubt." *Id.* at ¶ 33. In this case, this means that "the jury could either be 'firmly convinced' of [Finney's] guilt (and find him guilty) or 'think there is a real

11

possibility' that [he] was not guilty (and find him not guilty)," but "[b]oth things could not be true." *Id.*

¶ 24     Accordingly, we conclude that the trial court did not err in using the phrases "firmly convinced" and "real possibility" in its reasonable doubt instruction.

## 2.     Lack of Evidence

¶ 25     Finney also contends that the trial court's reasonable doubt instruction was erroneous insofar as it said the jury could consider "all the evidence" in determining whether Finney was guilty beyond a reasonable doubt, but it didn't convey that the jury could also consider any *lack of evidence* in making this determination. He points to the reinsertion of "lack of evidence" in the post-2022 model instruction (after the jury trial in this case) and argues that the omission of such language in the court's instruction constitutes structural error. We disagree.

¶ 26     Like the divisions in *Schlehuber*, ¶ 20, and *Melara*, ¶ 24, we conclude that the better practice for trial courts instructing on the beyond a reasonable doubt standard is to include a reference to the jury being able to consider the lack of evidence in the case. But, as in those cases, we conclude that the absence of any reference to the

lack of evidence in the trial court's reasonable doubt instruction didn't unconstitutionally lower the prosecution's burden of proof and, thus, wasn't structural error. *See Schlehuber*, ¶ 25; *Melara*, ¶ 32; *see also Melara*, ¶ 125 (Welling, J., specially concurring).

¶ 27 Various courts have recognized that the concept of reasonable doubt inherently invites jurors to consider what evidence may be missing and that the lack of evidence on an issue necessarily means the prosecution failed to satisfy its burden of proof. *See Schlehuber*, ¶¶ 21-22 (citing cases); *see also United States v. Rogers*, 91 F.3d 53, 56-57 (8th Cir. 1996) ("The [requested] language [that reasonable doubt may arise from the lack of evidence] . . . says nothing that is not already obvious to people of common sense. That a lack of evidence may cause one to have a reasonable doubt is self-evident."); *Laughlin v. United States*, 385 F.2d 287, 295 (D.C. Cir. 1967) ("[I]n a case where some lack of evidence for the government fairly creates a reasonable doubt of guilt, we may expect a normally intelligent jury to perceive that fact after comparison and consideration of all the evidence."). *See generally Leecan v. Lopes*, 893 F.2d 1434, 1443-44 (2d Cir. 1990) (rejecting

an argument that the trial court erred by failing to instruct the jury that reasonable doubt may be based on a lack of evidence).

¶ 28    Certainly, the instruction the jury was given in this case didn't indicate that it *couldn't* consider any lack of evidence in applying the reasonable doubt standard.  Indeed, "the absence of an express instruction to consider the lack of evidence is not tantamount to a prohibition on doing so."  *Schlehuber*, ¶ 21 (quoting *Melara*, ¶ 32). And, as with the instruction at issue in *Schlehuber*, ¶ 22, the instruction given in this case adequately conveyed the relevant standard to the jury by informing it that (1) the prosecution bore the burden of proof; (2) Finney was presumed innocent unless the prosecution met its burden; and (3) the jury had to consider "all the evidence" in making that determination.  *See also Petty*, 856 F.3d at 1311 (similar provisions in jury instructions made clear that "the Government must present evidence sufficient to establish [the] [d]efendant's guilt beyond a reasonable doubt and that a failure to present evidence sufficient to meet its burden must result in [the] [d]efendant's acquittal," notwithstanding the absence of language stating that reasonable doubt may arise from a lack of evidence); *Rault v. Louisiana*, 772 F.2d 117, 136-37 (5th Cir. 1985) (similar

provisions in jury instructions "conveyed the concept that a reasonable doubt would arise in the absence of evidence sufficient to show guilt beyond a reasonable doubt").

¶ 29    Accordingly, we conclude that, read as a whole, the instruction adequately informed the jury of the law, did not lower the prosecution's burden of proof, and did not constitute structural error.

## III.    Prosecutorial Misconduct

¶ 30    Finney next contends that the prosecutor committed misconduct during his initial and rebuttal closing arguments. We disagree.

### A.    Applicable Law and Standard of Review

¶ 31    We use a two-step analysis when reviewing a claim of prosecutorial misconduct. *People v. Trujillo*, 2018 COA 12, ¶ 36. First, we determine whether the prosecutor's conduct was improper under the totality of the circumstances. *Id.* And second, we determine whether any prosecutorial misconduct warrants reversal under the applicable standard of reversal. *Id.*

¶ 32    We evaluate claims of improper argument in the context of the argument as a whole and in light of the evidence before the jury.

*People v. Strock*, 252 P.3d 1148, 1153 (Colo. App. 2010). Prosecutors enjoy wide latitude in their use of language and their presentation style. *Domingo-Gomez v. People*, 125 P.3d 1043, 1048 (Colo. 2005). And because arguments delivered in the heat of trial generally aren't perfectly scripted, we accord prosecutors the benefit of the doubt when their remarks are ambiguous or simply inartful. *People v. Samson*, 2012 COA 167, ¶ 30.

¶ 33    Whether a prosecutor's statements constitute misconduct is a matter generally left to the trial court's discretion. *Domingo-Gomez*, 125 P.3d at 1049. We won't disturb the court's rulings regarding such statements absent a showing of an abuse of that discretion. *Strock*, 252 P.3d at 1152.

¶ 34    Finney preserved one prosecutorial misconduct argument by lodging a contemporaneous objection during the prosecutor's initial closing argument. We review this contention for nonconstitutional harmless error. *See People v. Ortega*, 2015 COA 38, ¶ 51. Under this standard, we will reverse if an error "substantially influenced the verdict or affected the fairness of the trial proceedings." *Hagos v. People*, 2012 CO 63, ¶ 12 (quoting *Tevlin v. People*, 715 P.2d 338, 342 (Colo. 1986)).

¶ 35　However, we review Finney's remaining contentions for plain error.  *See People v. Rhea*, 2014 COA 60, ¶ 43.  Again, plain error is an error that is both obvious and substantial.  *Flynn*, ¶ 39.  An error is obvious if it contravened a clear statutory command, a well-settled legal principle, or Colorado case law.  *Thompson v. People*, 2020 CO 72, ¶ 54.  An error is substantial if it "so undermined the fundamental fairness of the trial itself so as to cast serious doubt on the reliability of the judgment of conviction."  *Hagos*, ¶ 14 (quoting *People v. Miller*, 113 P.3d 743, 750 (Colo. 2005)).  "Only prosecutorial misconduct which is 'flagrantly, glaringly, or tremendously improper' warrants reversal."  *Domingo-Gomez*, 125 P.3d at 1053 (quoting *People v. Avila*, 944 P.2d 673, 676 (Colo. App. 1997)).  Prosecutorial misconduct in closing argument is rarely so egregious as to constitute plain error.  *People v. Sauser*, 2020 COA 174, ¶ 101.

## B.　Discussion

¶ 36　Finney argues that the prosecutor committed misconduct during his initial and rebuttal closing arguments by (1) appealing to the jury's interest in community values and civil order; (2) making a "golden rule" argument; (3) expressing his own personal opinion as

17

to Finney's guilt; and (4) misrepresenting evidence.  We address each argument in turn.

### 1.    Community Values and Civil Order

#### a.    Additional Background

¶ 37    During closing argument, the prosecutor summarized the evidence supporting each of the charges.  As to the vehicular eluding charge, the prosecutor argued, in part,

> The driver of that vehicle, Mr. Finney, knew or reasonably should have known that he was being pursued. . . .  [W]hen he ran over those Stop Sticks, he knew or reasonably should have known that there was an active chase that he was involved in and still he persisted in driving away.
>
> *That driving had consequences, it had consequences for Mr. Finney, it had consequences for [N.G.], for [her son], it had consequences for the members of the community who were on those roads as well, members like [the individual] whose vehicle was sideswiped*, because Mr. Finney was operating his vehicle in a reckless manner.[2]

(Emphasis added.)

¶ 38    Defense counsel didn't object to these statements.

---

2 Again, Finney was acquitted of the charge of failure to report an accident, which related to the vehicle he'd allegedly sideswiped.  But that fact isn't relevant to this issue.

¶ 39    As to the reckless endangerment charge, the prosecutor argued, in part,

> [W]e ask you to consider whether Mr. Finney . . . recklessly engaged in conduct that created a substantial risk of serious bodily injury to another person. *Specifically, this charge has been for [N.G.], but I also ask you to consider that there were other parties at risk as well. Members of the Douglas — I'm sorry, members of the Elbert County Sheriff's Department, like Sergeant Skalisky, who pursued that vehicle in order to prevent further danger to others. Members of the Douglas County sheriff who set up on the side of a road and deployed Stop Sticks in a manner designed to stop the progress of the defendant.*

(Emphasis added.)

¶ 40    Defense counsel objected, asserting that the prosecutor was inviting the jury to consider potential victims other than N.G., who was the sole named victim for the reckless endangerment charge. The court overruled the objection.

¶ 41    The prosecutor continued, saying,

> *Now, again, [N.G.] is the focus of this specific charge. She is the listed victim in this charge, but other members of the community were at risk.* A chase for that long of a time, over 9 miles, almost 10, is *a dangerous situation for anyone involved, which includes Elbert County sheriffs, Douglas County sheriffs, the Parker Police Department that responded and members*

*of the community like* [*the individual whose car was allegedly sideswiped*]. Over 9 miles of pursuit at high speeds in dark or unlit conditions *putting everyone at risk.*

(Emphases added.)

¶ 42     Then, during rebuttal, the prosecutor argued more generally,

[*T*]*he laws in this case exist for a reason, and they exist to keep us safe. Every law in this case, every charge in this case exists to keep us safe.*

*And all Sergeant Skalisky was trying to do is his job that night by keeping us safe,* so he was going to pull him over, turns on his lights and the defendant pulls over. He recognized that law, he knew it was a cop. Pulls over to the side of the road . . . , and that's where the reasonableness of his behavior stopped and the crime started, the really serious crimes.

He took off. Took a U-turn, headed back up the road and then the speeding began, which was where all the danger began. The passing on the double yellow lines, numerous cars, several cars Sergeant Skalisky testified. Going through that stop sign at Delbert Road and Singing Hills, and that's a scary intersection because . . . if you go through that stop sign, that's rough.

Then the next one, the yielding. He failed to yield at the intersection where Hilltop continues from Singing Hills. *That could be a crazy intersection, lots of accidents.* He . . . zooms through there. And then he starts crossing double yellow lines because he is going to get away. . . .

20

> Think about watching that scene, somebody crossing over lines like at that, passing several cars at once. Why do you think in your head? *When I see that or you see that, you say that guy is going to kill somebody.* Definition of recklessly. Talks about disregarding substantial risk that something could occur, that he could end up causing serious bodily injury to something else because of how he's driving.

(Emphases added.)

¶ 43    Defense counsel didn't object to any of these statements.

¶ 44    Later, the prosecutor reiterated the dangers of Finney's actions, including running a red light at eighty miles per hour while there was a car in the intersection. He then said, "It's a miracle nothing worse happened."

¶ 45    The prosecutor ended his rebuttal argument by saying,

> [H]e was able to outrun the cops that night. He was able to outrun Sergeant Skalisky despite his best efforts to stop him. *He created a lot of danger in this community. He put a lot of people at risk,* [N.G.] and [her son] right in his car, and *he's been able to outrun justice for a long time now, hasn't he? Over three years.*[3]
>
> *It's time for you all to put a stop to that. Your job as jurors is to find whether or not he committed these offenses and to sign these guilty verdicts, because that is the only just*

---

[3] The trial was held about three years after the incident.

> *verdict.  It's the only fair verdict, and it's the*
> *verdict that all the evidence supports.*  So we're
> asking you for verdicts of guilty on all six
> counts.

(Emphases added.)

¶ 46    Again, defense counsel didn't object to any of these statements.

### b.    Discussion

¶ 47    Finney's sole preserved contention is that the prosecutor impermissibly broadened the scope of the reckless endangerment charge beyond the named victim, N.G., inviting the jury to consider other individuals — and the public at large — as victims.  We aren't persuaded.

¶ 48    While the prosecutor did invite the jury to consider the risks that Finney's reckless conduct posed to other individuals involved in the incident, he also specified twice that N.G. was the named victim for the reckless endangerment charge.  Thus, we don't discern any impropriety.  And even if the prosecutor's statements were improper, we can't conclude that they were likely to have substantially influenced the verdict or affected the fairness of the trial proceedings — particularly given that the jury instruction on

reckless endangerment specified that in order to establish the elements of the offense, the prosecution had to prove that Finney "engaged in conduct that created a substantial risk of serious bodily injury to another person, *specifically, [N.G.]*"  (Emphasis added.) *See Hagos*, ¶ 12; *see also People v. McKeel*, 246 P.3d 638, 641 (Colo. 2010) ("We presume that jurors follow the instructions that they receive.").

¶ 49     Finney also asserts more broadly for the first time on appeal that the prosecutor's argument repeatedly appealed to the jury's interest in community values and civil order.  Again, we aren't persuaded.

¶ 50     "A prosecutor should not use arguments calculated to inflame the passion or prejudices of the jury."  *People v. Clemons*, 89 P.3d 479, 483 (Colo. App. 2003).  This includes statements urging the jury to convict the defendant in order to protect community values, preserve civil order, or deter future lawbreaking.  *Ortega,* ¶ 54.

¶ 51     Here, the prosecutor did reference the dangers Finney's conduct posed to members of the community — particularly the law enforcement officers and bystanders in the area at the time.  And he may have appealed to the jury's sense of justice insofar as he noted

23

that Finney's conduct created a danger to those people and to the public generally. But some of the charges did involve elements of recklessness, thus requiring the prosecution to prove that Finney had acted with "conscious[] disregard[] [of] a substantial and unjustifiable risk that a result will occur or that a circumstance exists." § 18-1-501(8), C.R.S. 2025. Specifically, as part of its burden of proof on the vehicular eluding charge, the prosecution had to establish that Finney was "operat[ing] his . . . vehicle in a reckless manner." § 18-9-116.5(1), C.R.S. 2025. Also, the jury was instructed on the lesser included offense of reckless driving, which required the prosecution to prove that Finney drove "in such a manner as to indicate either a wanton or a willful disregard for the safety of persons or property." § 42-4-1401(1), C.R.S. 2025; *see also People v. Griego*, 2018 CO 5, ¶ 38 ("wanton or a willful disregard" can be equated with recklessness). Thus, the danger Finney's conduct posed to the public was directly relevant to the case, even if it wasn't directly relevant to the reckless endangerment charge, and most of the challenged statements were not tied to that particular charge. *See Strock*, 252 P.3d at 1153 (the prosecutor's argument that the defendant's conduct in driving while intoxicated

24

had made him "a loaded gun" for every person driving the same road that night wasn't an improper appeal to the jury's sympathies).

¶ 52    Also, while the prosecutor did say that the charges at issue exist to keep the public safe and that Sergeant Skalisky was doing his job in an effort to "keep[] us safe," the prosecutor didn't expressly ask the jury to convict Finney based on a broader goal of deterring future lawbreaking or doing justice for other strangers. *Cf. Ortega*, ¶¶ 48, 54 (the trial court erred by allowing the prosecutor to argue that the jurors should care about the illegal distribution of marijuana because they "should care for this city," they don't want to have an "open drug market" in certain parts of the city, and they want people "to have jobs and to be productive members of society" rather than "to be drug dealers"); *Clemons*, 89 P.3d at 483 (the trial court erred by allowing the prosecutor to say "the only thing necessary for the triumph of evil is for good men to stand by and do nothing," characterize the defendant's actions as "evil," and urge the jury not to "stand by and do nothing").

¶ 53    Finally, the prosecutor's reference to Finney "outrun[ning]" not only "the cops" but also "justice" for three years and his request that the jury "put a stop to that" was a mere "rhetorical flourish[]"

25

that didn't encourage the jury to convict Finney on an improper basis. *Domingo-Gomez*, 125 P.3d at 1048; *see also People v. Vasquez*, 2022 COA 100, ¶ 62 (A prosecutor "may employ rhetorical devices, engage in oratorical embellishment, and use metaphorical nuance.").

¶ 54    Accordingly, we discern no misconduct — and certainly not any conduct that was so flagrantly, glaringly, or tremendously improper as to warrant reversal under the plain error standard. *See Domingo-Gomez*, 125 P.3d at 1053.

## 2.    Golden Rule

¶ 55    Finney next asserts that, by asking the jury to imagine being at the scene and to think about the effect of Finney's conduct on other people, the prosecutor's arguments violated the "golden rule." We disagree.

¶ 56    Finney relies in particular on the prosecutor's statement, "Think about watching that scene, somebody crossing over lines like at that, passing several cars at once. Why do you think in your head? When I see that or you see that, you say that guy is going to kill somebody." He also references the prosecutor's statements

referring to the effects of Finney's conduct on Sergeant Skalisky and on the bystander whose vehicle Finney allegedly sideswiped.

¶ 57     A "golden rule" argument invites jurors to put themselves in the place of the victim and imagine that the defendant wronged them personally. *People v. Dunlap*, 975 P.2d 723, 758 (Colo. 1999); *People v. Randell*, 2012 COA 108, ¶ 87. Such an argument is improper in the guilt phase of a case because it could encourage the jury to decide based on personal interest and emotion rather than on a rational assessment of the evidence. *People v. Munsey*, 232 P.3d 113, 123 (Colo. App. 2009).

¶ 58     While the prosecutor asked the jurors to imagine how they would've perceived Finney's conduct had they witnessed it that night, it was in the context of assessing whether they would've perceived the conduct as reckless — not as a way of imagining that they could've been victims. Because the prosecutor didn't either explicitly or implicitly ask the jurors to place themselves in the place of N.G. or any of the other victims or bystanders that night, he didn't make a true "golden rule" argument. And even if his statements could have been construed as such an argument, they certainly weren't so flagrantly, glaringly, or tremendously improper

as to warrant reversal under the plain error standard. *See Domingo-Gomez*, 125 P.3d at 1053.

### 3.  Expression of Personal Opinion or Belief in Guilt

¶ 59  Finney also asserts that the prosecutor improperly expressed his own personal belief in Finney's guilt.  We again disagree.

¶ 60  Finney challenges the following statements by the prosecutor during his initial and rebuttal closing arguments:

- "We know the facts, we know what happened, we know how it happened.  We know who the driver was, and after you've examined that evidence that's been presented to you, I ask you, the People ask you, to find . . . Finney guilty of all charges."

- "Finney is as guilty as could be of every single count in this case."

- "I think the evidence is overwhelming, and you can take any case as defense has, and twist and turn facts, say them a little differently, say cross-examination brings out all truth, but think that, they said in opening statement this case is about a lot of bad acts, but he didn't do it, it wasn't him, he wasn't driving."

- "How else do we know that it's Anthony Finney that's driving? I mean, I think the evidence is overwhelming . . . ."

¶ 61 Because prosecutors are government officials, their opinion has the potential to carry more weight with the jury. *People v. Vialpando*, 2022 CO 28, ¶ 42. Accordingly, prosecutors may not express their personal opinion or belief as to the guilt of a defendant. *Domingo-Gomez*, 125 P.3d at 1049.

¶ 62 Here, the prosecutor didn't express such an opinion or belief. He didn't use the words "we know" or "I think" in a way that indicated he was expressing his own opinion about Finney's guilt. Rather, he appeared to be simply highlighting evidence that proved the charges. At worst, his use of those words may have been inartful, but it didn't suggest that he was trying to impress upon the jury his own belief that Finney was guilty. *See Samson,* ¶ 30; *see also People v. Villa*, 240 P.3d 343, 358 (Colo. App. 2009) (the prosecutor's statement requesting that the jury "[f]ind [the defendant] guilty, because he is guilty" was not a statement of the prosecutor's personal opinion but was "simply asking the jury to make a reasonable inference that [the] defendant was guilty based

on the evidence presented at trial"); *People v. Rogers*, 220 P.3d 931, 938 (Colo. App. 2008) (the prosecutor's statements referencing what "the People believe" and what "we believe" had been proved by the evidence, read in context, "were commentary on the evidence and not, as defendant now suggests, expressions of personal opinion or allusions to evidence not presented to the jury"), *overruled on other grounds by*, *Garcia v. People*, 2022 CO 6. And, as before, even if there was any error, it didn't rise to the level of plain error. *See Domingo-Gomez*, 125 P.3d at 1053.

### 4.     Misrepresentation of Evidence

¶ 63     Finally, Finney contends that the prosecutor misrepresented N.G.'s testimony during closing arguments. We disagree.

¶ 64     When discussing N.G.'s recorded statements to law enforcement officers, the prosecutor argued,

> [Y]ou heard this bit of the video, "How did you feel when he was driving that fast?" She said, "Freaked out." Sergeant Skalisky said, "Did you think you were going to die?" Because remember, he's looking at this for what the possible charges are. . . . So he's trying to get her to talk. He's trying to get her to tell him what is the truth, what happened.
>
> And then she [sic] says to that, "Did you think you were going to die?" She says, "When he

started hitting stuff." "When did he hit stuff," asked Sergeant Skalisky. She says, "Right up the street here." She is talking about exactly what happened.

¶ 65 Finney contends that the prosecutor misrepresented N.G.'s statements by only partially summarizing them. In particular, he notes that in response to the interview question whether she thought she was going to die, N.G. had answered, "No, I didn't think I was gonna die," and that her reference to "when he started hitting things" was in saying that's when she'd told him to "stop." Thus, Finney argues, in merging together those two statements, the prosecutor indicated that N.G. had said she thought she was going to die when, in fact, she had said the opposite.

¶ 66 Closing arguments may properly include the facts in evidence as well as any reasonable inferences drawn from those facts. *Domingo-Gomez*, 125 P.3d at 1048; *People v. Buckner*, 2022 COA 14, ¶ 18. "Indeed, closing argument allows advocates to point to different pieces of evidence and explain their significance within the case." *Domingo-Gomez*, 125 P.3d at 1048.

¶ 67 Here, the prosecutor fairly pointed to and commented on portions of N.G.'s statements to highlight the recklessness of

Finney's conduct. There may have been some ambiguity as to whether N.G.'s initial response that she "didn't think [she] was gonna die" referred to the initial parts of the chase and whether, when she went on to say that "when he started hitting things, then [she] was like . . . 'stop,'" she was suggesting that at that point she became fearful for her life. Thus, the prosecutor's summary of what N.G. said wasn't necessarily erroneous.

¶ 68    And while the prosecutor didn't repeat all of N.G.'s statements verbatim, there is no indication in the record that he intentionally omitted portions of her statements or sought to mislead the jury. *See People v. Herold,* 2024 COA 53, ¶ 84 (the prosecutor's assertion about certain evidence in closing argument wasn't improper because the underlying evidence was "vague" and "[e]ven if the . . . assertion was a misstatement, nothing in the record suggests that the prosecutor *intentionally* misstated the facts"); *see also Domingo-Gomez,* 125 P.3d at 1049 ("The prosecutor should not *intentionally* misstate the evidence or mislead the jury as to the inferences it may draw." (emphasis added) (citation omitted)).

¶ 69    Accordingly, "given the 'wide latitude' granted prosecutors to argue 'reasonable inferences that may be drawn from the evidence,'"

32

we perceive no error in the court allowing the prosecutor's statements. *Herold*, ¶ 85 (first quoting *Domingo-Gomez*, 125 P.3d at 1048; and then quoting *People v. Walters*, 148 P.3d 331, 334 (Colo. App. 2006)). And, once again, even if there was any error, it didn't rise to the level of plain error. *See Domingo-Gomez*, 125 P.3d at 1053.

## IV. Cumulative Error

¶ 70 Lastly, Finney asserts that the claimed errors cumulatively deprived him of the right to a fair trial. "For reversal to occur based on cumulative error, a reviewing court must identify multiple errors that collectively prejudice the substantial rights of the defendant, even if any single error does not." *Howard-Walker v. People*, 2019 CO 69, ¶ 25. In other words, reversal is warranted under the cumulative error doctrine only when "the cumulative effect of [multiple] errors and defects substantially affected the fairness of the trial proceedings and the integrity of the fact-finding process." *Id.* at ¶ 24 (alteration in original) (quoting *People v. Lucero*, 615 P.2d 660, 666 (Colo. 1980)).

¶ 71 In this case, we haven't identified any errors. Nonetheless, in our analysis of each of Finney's prosecutorial misconduct

33

arguments — that the prosecutor appealed to the jury's interest in community values and civil order, made a "golden rule" argument, expressed his own personal opinion as to Finney's guilt, and misrepresented N.G.'s testimony — we reasoned that even if there was any error, that error wasn't plain. We further conclude that even if two or more of these issues represented an error, those errors, viewed together, did not render Finney's trial unfair or affect the integrity of the fact-finding process. *See id.* at ¶¶ 24-25. As we've indicated, none of the alleged misconduct was "flagrantly, glaringly, or tremendously improper." *Domingo-Gomez*, 125 P.3d at 1053 (quoting *Avila*, 944 P.2d at 676). Moreover, substantial evidence supports the jury's verdicts, and the jury was properly instructed on the victim or victims applicable to each offense. Therefore, we conclude that the purported misconduct didn't affect the outcome of the proceedings.

## V.    Disposition

¶ 72    The judgment is affirmed.

JUDGE WELLING and JUDGE SULLIVAN concur.